And good morning. The first case this morning is number 13-1655, Pure Fishing, Inc. v. Normark Corporation. Mr. Maness. Thank you, Your Honor. May it please the Court. I'm Marcus Maness, along with Nixon Pruitt, LLC. I represent the appellant, Pure Fishing, Inc. This appeal is about the proper deference to a jury on issues of fact. On each issue in which the district court found summary judgment, derivation, anticipation, and obviousness, there were disputes, genuine disputes of material fact, which should have gone to the jury prior to the final legal conclusion on these affirmative defenses. The appellee, Rapala, bore the burden of proof by clear and convincing evidence on each of the affirmative defenses, and every inference should have been drawn in favor of Pure Fishing. This did not happen below. What's the contrary evidence on derivation? Your Honor, on derivation, there is, as this Court knows, a period of time when an invention is developed. It's often over time. The Pure Fishing chemist in the lab, Roger Cook, and his supervisor at that point, Danny Foote, began heating gel-spun polyethylene braids in May of 1993, seeking to see if there was some change in their properties. Heating but not stretching. In fact, Your Honor, that first experiment did stretch. They didn't measure it at the time. They weren't aware of it. So from that standpoint, it was just heating. But the idea was the properties changed. It became stiffer, and if you look at Mr. Foote's lab notes, who was in charge at that point of the project, he says on page 608 of the record, I'm going to go do a tensile test on this, which would have shown the stretching. Unfortunately, we don't see the results of that anywhere in the record. We proceed from there to August of 1994. Obviously, Mr. Cook and Mr. Foote have been thinking about what can we do with this new product, this gel-spun polyethylene. We've stretched Dacron braids in the past. We've stretched nylon monofilament, as Rapala points out. Prior to meeting with a supplier of the gel-spun polyethylene, Allied Cycle… But the invention here isn't heat-stretching. That was well known before, right? Your Honor, lots of materials are heat-stretched, but that is indeed the invention of 214. It's heat-stretching the braid to increase tenacity. Without regard to the parameters? Oh, no, sir. The parameters are stated within the… What was his invention? Heat-stretching within particular parameters? Yes, sir. Within the parameters of about 130 to about 150, and a total draw ratio of something greater than 1 to about 2, thereby decreasing to the near and increasing the tenacity of the line. So, what's the evidence that he invented that before hearing from DSM through Foote? Well, number one, Mr. Foote says before meeting with Allied Signal in August of 1994, let's not tell them the work we've been doing with braids. Allied Signal then says during the course of their meeting, here's a sample of a stretched braid. Don't talk about its characteristics or what we've done. Prior to the meeting with DSM, Pure Fishing sends Allied Signal a spool of gorilla braid, unstretched gel-spun polyethylene braid, and says heat-stretch this for us and tell us what happens. And we'll measure it first and we'll measure it again when we get it back. And what you see at that point is there is a decrease in denier, an increase in tenacity, and some fusing because Allied Signal stretches it at 2.1, outside the parameters of the invention, and 155 degrees, also outside the parameters of the invention. So, clearly Pure Fishing has been working on, thinking about, and directing its supplier… He said he got the parameters from DSM or from somebody else. It wasn't his invention. He testified in response to a leading question, and was consistent with that after that, that he got those parameters from DSM. But, Your Honor, if you look at how that evolved, first of all, Mr. Foote says we were doing that work beforehand, and he was the supervisor for it. He said that consistently. If you'll look, there's a memo in the file, in the record, from July of 1996, when he is talking to his superiors about this particular area, that we need to use the braided line, not just the fused line. And he says, Roger Cook was doing work on this prior to my time. Where does he say that the parameters were arrived at before the information from DSM? He does not. He says the work was being done prior to the meeting with DSM and prior to the meeting with Allied Sigma. He does not say the specific parameters. Now, what he does say about DSM, and DSM's research director, Egbert Van Gorp, agrees, is Pure Fishing provided them with gorilla braid to stretch. Mr. Van Gorp is an unusual case. Both sides' experts actually had some factual involvement 20 years ago. Mr. Van Gorp was the expert for Pure Fishing. He was also the research director of DSM in October of 1994. And in the record, Your Honor, he testifies, we had no braiding machines, we had no braids, we had no reason to independently work with braids. Anything we did with a braid was because our customer, potential customer, Pure Fishing, asked us to. In that case, Your Honor, I think the inference of fact is, we have fallen clearly with the EP, section number correct, excuse me, 213701. Here, Pure Fishing has asked its supplier, assist us, we have an idea, we're thinking about it. What would be the conditions you would use as a yarn manufacturer? Those conditions were supplied. At that point, Mr. Cook goes in the lab, and that invention is not complete. He begins his work in October of 94. He does hundreds of experiments before April of 95, when finally the fire line, the fused line, is actually able to be put into production shortly thereafter. And then the unfused comes into production later, some years later. The most recent case dealing with that section of the MBEP is the Metrics USA case from the District of Massachusetts. In that case, Your Honor, the court had found that there was inequitable conduct. And it revisited that ruling in light of Therosons. And one of the things that it found for inequitable conduct was you did not disclose an inventor of this invention. Mr. Manos. Yes, Your Honor. Why wasn't it clear about the existence of a NEPA fact finding that the fire line products anticipated patent? Your Honor, anticipation is also a question of fact. The fire line products have a two-step draw that's required to get to the fire line invention. One of them was within the claims. Yes, sir. The first step of drawing is within the claims, the first step of stretching. So the second step doesn't necessarily bring it outside the scope of the claims. Your Honor, I would disagree. I think if you look at traditional holdings and process patents, the result of the process needs to be the same. They are not here. For an intermediate step to be anticipating, it would have to be something that is taught to the public and understood by the public to stand alone. There's nothing in the fire line process, and that teaching goes back to the Meade-Johnson serials case cited by Rapala from the Tenth Circuit in 1943. Where it distinguished a large number of process patent cases that said that intermediate step does not anticipate by saying yes, but in this case, that intermediate step was independent, and you could tell from the patent that it stopped. And you could look at it and be taught what the intermediate step did. That's not what happens in fire line. In fire line, it's a first step of a two-stage process to get to a result, a fused or semi-fused line. That result is shown, of course, in the specifications of the fire line patent at 550 through 561 of the record. But when you look at the 214 patent, there is a clear limitation. The very last line... It doesn't say one step, though. There isn't a limitation in the claim that says that there's only one step. No, that's correct, Your Honor. There's a temperature within the range of 110 to 150, which was in the product that was sold. But a second step was utilized as well. But that doesn't take it out from within the scope of the claim. Your Honor, the intermediate step, its teaching is not to stop there. It's to keep proceeding in the fire line product. There's nothing in the fire line patents or the process itself that would tell the practitioner, you can stop right here and you'll get a different product. You'll get a different result. And that's the distinction. Plus, Your Honor, the clear language of Claim 1 of the 214 requires that the total draw ratio occur in the 130 to 150 range. And the total draw ratio in the fire line process did not occur because the second step occurred outside of it. I mean, the problem you have is this is a comprising claim. So another step is permissible. And if you were dealing with infringement rather than invalidity, you'd certainly be arguing that the fire line product, if the fire line product were accused of infringement, would infringe even though they went on and performed another step, which was outside of the parameters of the claims, wouldn't you? I don't believe so, Your Honor. In specific, this client viewed both those inventions independently. So somebody could avoid infringement just by adding another step? Not necessarily, Your Honor. In this process case, yes. The typical goods case show, for example, Powder Magic cited by Rapala, if the skis already have the turns up end and the skis already have the foot brace, adding the runner on the bottom, you know, adding that step doesn't keep you from infringing. Agreed. But in the process case where it's not obvious or not taught to the public that that other result is there, then no, producing a fused line after heating it in a second step would not infringe the 214 patent. The 214 patent itself is limited to an unfused product. In Honeywell, for example, the last line of the description states, Line made according to the invention retains the opaque white color of the virgin yarns, which Mr. Van Gorp and the engineer Joe Meyer testified to a person of ordinary skill in the art means it's unfused. Once you fuse it, it becomes partially or totally translucent. And in addition, if one looks at the examples above Table 11 and 12, the only set of examples where this is said in the entire patent, that the line of examples 28 through 41 were stretched under the conditions of the invention, the other examples do not say that, says it results in an unfused braided fishing line. And that's the key difference between the FireLine process and the 214 process. They result in two different products. The intermediate step is not a step that is taught where you can stop it and result in that product. The district court's ruling on obviousness relied upon its finding of anticipation to bridge the gap to the prior art. If the anticipation falls, so does that. The district court also only gave one line consideration to secondary factors, which is required to consider under John Deere and KSR, where it simply said secondary evidence is unimportant and moved forward from there. I see I'm actually into my rebuttal time, Your Honor, and we will... I will save you rebuttal time. Let's hear from the other side. Thank you, Your Honor. Mr. Fish? Good morning. May it please the Court, I represent Normark Corporation, which is known as Rapalux, the same, that's the brand name that we go by. Let me start with Judge Dyke's first question, what's the contrary evidence of derivation here? And that was really the key issue. Throughout the entire case, there were five undisputed facts that were laid out in our briefing. Mr. Cook testified that his conception date was October 5, 1994. That was the first date he ever did work on this. That's the start of all the work that led to the 214 patent. That's undisputed fact number one. Undisputed fact number two is that before that date, DSM recommended to Pure Fishing that they should use this process, these exact parameters that are in claim one. It is not correct. There is no evidence in the record that PFI asked DSM for that recommendation. That is not correct, not in the record. Undisputed fact number three is that DSM, before October 5, 1994, actually performed the invention, took Gorilla Braid, heat-stretched it, increased its tenacity using exactly these same parameters that are in the claims. Not disputed. Undisputed fact number four was that Mr. Cook testified that his invention, his conception date of October 5, 1994, was actually based on DSM's recommendations. That's why he did what he did on October 5, 1994. And then undisputed fact number five is that Mr. Cook testified repeatedly in deposition and at the inequitable conduct trial this invention, using heat-stretching to increase the tenacity of a braided fishing line in these parameters, was not my idea. It came from DSM. It came from Allied Single. It came from someone else other than me. Not my idea. And he was adamant about that. He was directly challenged at the inequitable conduct trial, are you, Mr. Cook, claiming an earlier conception date? And he said no. October 5, 1994 is my conception date. Now, what we have, what's the contrary evidence? After all that evidence was presented, what Pure Fishing did was try to claim May 1993 as an earlier conception date, despite all of that evidence from Mr. Cook's notebook from his own testimony. And Mr. Cook testified about that May 1993 date, of that May 1993 work, and what we have to always keep sight of in this case is we don't want to lose sight of what the claims are. We never hear about the claims in the patent from Pure Fishing. The claims require stretching at a positive draw ratio, which is defined in the patent as the output roller has to be going faster than the input roller. That's in the definition. So to have stretching, you must stretch the material at this positive draw ratio. That was not what Mr. Cook was doing. He testified that he was not stretching, that he was doing something called heat setting, keeping the line at a constant tension, not stretching. But focusing on the claims, as you stated, which is necessary and correct. Let's get back to the question I asked your opponent about the two steps. The fire line issue, yes. Yes, the anticipation from the sale. It was made by including a second step with a temperature over 150 degrees. Your opponent says that gets it out from anticipating the claim. That's right, Your Honor. What's your answer to that? That's just not my understanding of the law. We cited several cases, the cases that we could find, that if you find all elements in the prior art, that you've anticipated the claims. And therefore, the fact that everyone is in agreement, that stage one of the fire line fused process matches claims one, four, and five, that invalidates the patent. That's just my understanding of the case law. I haven't seen, cited to me, or found on my own, contrary case law that would say in a process setting, somehow it's different. The other thing that I would really like to emphasize on the fire line issue is the distinction that Mr. Manos continues to attempt to make between fire line process and the 214 patent is just simply not correct. The 214 patent is not limited to an unfused fishing line. There's no claim term in the patent claims that would allow the court to read that limitation into the claims. And Judge Curry was correct in not doing so. It would require misreading the specification and then reading a limitation into the claims. And Judge Curry was also correct in looking at the fire line patents and what they say, and that really gives the answer. You'll notice in their reply brief, they don't address the fused-unfused distinction, the arguments that we made, because there is no answer to it. In the fire line patents, the fire line patents examples 11 and 13 show that if you heat stretch a braided GSP fishing line at 148 and 152 degrees using mineral oil, you will result in a well-fused line. That is the fire line examples, that's the teaching of the fire line patents. And the fire line patents also say that the line will increase in tenacity. In the 214 patent, they claim exactly that parameter in Dependent Claim 9. In other words, Dependent Claim 9 says use mineral oil with heat stretching at about 150 degrees. That's exactly the conditions that resulted in a well-fused line in the fire line patents. So this distinction he's making that these processes are somehow different is just not supported by anything in the intrinsic record when you're trying to do a claim construction here. I suppose a final point would be this claim construction was made up only in response to the fire line. In other words, during the claim construction process, they wanted to construe the claims at 159 degrees, which everyone agrees would cause fusing. So they changed their view of what the patent meant. So that's that. Let me, if I could, get back to the derivation point and just finish up my thoughts on that. So Mr. Cook himself, his own testimony, his own notebooks, established that he did not have a complete and operative idea of the invention in May of 1993 because he was doing something different. There's no stretching. There's no evidence of increase of tenacity in that work in May of 1993. This is a digression a little bit, but I think it's an important one. In their reply brief, I think it's on page 17, or no, it was on page 2, they say, well, there was an increase in tenacity. It just wasn't recognized at the time. And they cite to the record to the patent lawyer's testimony 20 years later. It's just not correct. It's not right. There was no evidence in those documents or in the testimony by Mr. Cook or Mr. Foote there was an increase in tenacity. So what he was doing in May of 1993 is not the claims. He's doing heat setting at a constant tension, no stretching, just a different issue. The district court said that when Cook was asked what he believed he had invented, he did not claim credit for inventing the subject matter of claims 1, 4, and 5. Instead, Cook testified that what was new about his work was that, quote, we pushed the draw ratios to a high level. Were those draw ratios in the claim? No. The draw ratios in the claim start at the lowest possible level. The lower ratios. Yes. At about 1.0, which was construed by the district court. So it wasn't that Cook might have been a co-inventor. No. No, that's right, Your Honor. I mean, it's a hypothetical. If he had limited his claims to a very high draw ratio and explained some benefit from that in the patent itself, would he have been able to get an invention? We don't know. But that's not what was claimed. That's right. And that's all he ever, ever claimed in his. So you're saying he conceded that he wasn't the inventor of claim 1. Over and over again, Your Honor. Over and over again. That's right. So that's really what I have on derivation and on the fire line, unless the court has more questions. And just briefly on obviousness, this is really of a piece with the first two arguments in that the entire obviousness argument is resting on undisputed facts. So it's a classic application of KSR by the district court to undisputed facts. And undisputed fact number one is that example 7 of the Dunbar patent is the 214 process. It's identical to it. It teaches heat stretching of a braided GSP line at the same temperatures and at the same draw ratios. The only difference between example 7 and the 214 claims is that the individual yarns that make up the braid are 1190 denier, which is a measure of thickness, rather than about 1,000 denier. That was the only difference. That difference was supplied to the person of ordinary skill in the art with omniscient knowledge of the art by FireLine, because FireLine has much smaller deniers and used heat stretching. It's also supplied on the very same page of Dunbar example 7 because their sample 1 has smaller denier yarns. And everyone agrees. Again, their expert testified that if you use sample 1 of Dunbar instead of sample 5, you've now performed the 214 invention. So the idea is that the person of ordinary skill wouldn't be so dense that they couldn't make the invention having all that in front of them. Those are the undisputed facts that led to it. The other undisputed fact, never contested, not in the briefing, ever contested below, is that Mr. Cook and Mr. Van Gorp both testified that their disinvention was obvious. Mr. Van Gorp went on at quite some length with graphs and everything to explain that if you have a braided line of GSP and you stretch it under heat, you're going to get this mechanical strengthening, this mechanical increase in tenacity, just by pulling the braids tighter and evening out those yarns. And he said that was a known and expected result in light of Hogenboom and in light of Ryan. He was very clear about that. The big distinction they make on obviousness is to say, well, the 214 deals with fishing line, which is somehow smaller than Dunbar. Well, that's not correct because 214 claims are 64 yarns of 1,000 denier. That's the scope of the claim. That's much larger than Dunbar. But in any event, their witnesses, Cook and Van Gorp, both testified, you know what? It's easier to stretch a fishing line. We know, once we know how to stretch a rope to increase tenacity, we know that we're going to get increase of tenacity with fishing line. It's easier to do fishing line because of the heat transfer issues because it's smaller. It's just easier to do the rope. So the obviousness decision was a simple, straightforward application of KSR to undisputed fact. So unless the court has more questions, that's all I have for today. Any questions? Any questions? Thank you, Your Honor. Thank you, Mr. Vick. Mr. Maddox. Thank you, Your Honor. Looking first at anticipation, the limitation can be read from the description. Under Honeywell, where there is a clear limitation to one would understand who is skilled in the art, stated in terms of definiteness, which it is there. It's not the number of times it's mentioned. It's not mentioned as a preferred embodiment, as one of several opportunities, as one of several results. It is said that line, according to the invention, will remain opaque, white color of the natural yarn, which means it's not fused. Now, that's what Mr. Van Gorp testified to. That's what Joe Meyer testified to, that one would understand who is skilled in the art. But, Mr. Maddox, what about the testimony of the inventor, who says, I didn't invent Claim 1, and who was asked the question, there's no difference between what DSM told Foote to do and Claim 1, is there? And he said, no. That's correct. He absolutely said that, Your Honor. Again, DSM's director of research testified, we had no reason to stretch a braid unless our customer wanted us to. We had no braided material in our own factory. We don't do that. We don't have braiding machines. So they got a braid, they got it from Pure Fishing, they did it for a visit by Pure Fishing, and they discussed it with Pure Fishing. For a lot of companies in this world, using your supplier as a source of knowledge to help you with an idea is normal. If there was any belief that DSM was the inventor, Your Honor, there was absolutely no reason not to list someone from DSM as an inventor. These companies had, as the record shows, an agreement between them that any inventions done jointly between them belonged to Pure Fishing in terms of fishing lines in the United States. That's a question of ownership rather than inventorship. Yes, sir, it is. But I think it also shows from a standpoint of inference why in the world, if anybody thought DSM truly was the inventor, if they hadn't conducted experimentation at the direction of Pure Fishing, why wouldn't they have listed a DSM person as an inventor? They would have. There was no reason not to. There was no economic disincentive to having a co-inventor on that patent, or frankly, even just a DSM inventor under the way their agreement was written. It's because the parties believe Roger Cook's, or Pure Fishing believe that Roger Cook's experimentation did indeed... That raises a genuine issue of material fact that they didn't list the DSM on the patent? Your Honor, I think in combination with the fact that DSM itself testified we didn't have grade, we wouldn't have done this in the ordinary course of business, we were requested to do this by a customer, the only reason we would do it, plus Mr. Foote's testimony, which is consistent that he believed Roger Cook was doing these experiments. Cook says otherwise. There's no question about that. But that is a contested fact. Mr. Foote has been very consistent prior to the litigation in writing, both in October of 94 and July of 96, in saying, Roger Cook was working on this before we went to Allied Cycles. But this doesn't include the parameters of those points, right? He has not been specific about the parameters, that's correct, Your Honor. He has said heat stretching, and if you look at the two pages of his deposition, you have to connect from two different places in the record, and I think it's worth my pointing out the specific pages to you. Oh, shoot. Excuse me. There are two pages, one appears at the end of the record because it's been added from Mr. Foote's deposition where he talks about what was being heat stretched prior to the meeting with Allied Signal. And in the first page, he talks about Dacron and he talks about nylon. In the second page, which I believe, and I may have the number wrong, so I apologize because my note's not here, I think it's 2388, he says, no, we were heat stretching GSP before we went to those meetings. Now, he does not say the parameters, but he does say they were heat stretching the material. I think we need to wrap it up if there's one final thing you need to tell us. Under obviousness, Your Honor, I think it's important that the Hogenboom, Ryan, and Dunbar references were all before the examiner. There's nothing in the Dunbar Canadian patent that suggests the feed yarn from sample one should be switched with sample five when performing example seven so that you can get within the scope of the 214 patent. There's nothing in its teaching that suggests that. There's no motivation that suggests that. There's nothing in the record. I believe the examiner's finding that this was not an obvious invention in light of the prior art was the correct one and should have carried some weight at the district court. Without the bridge of anticipation to fishing line, that doesn't happen. For the remaining arguments, we rely upon our brief, particularly as to the amendment for the doctrine of equivalence, which we haven't mentioned. Thank you, Your Honor. Thank you, Mr. Manos. Mr. Vick, the case is taken under submission. Thank you.